## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W.<br>Suite 3000<br>Washington, D.C. 20530, | |
| | CASE NO.: |
| Plaintiff, | |
| v. | JUDGE: |
| | DECK TYPE: Antitrust |
| CEMEX, S.A.B. de C.V.,<br>Av. Ricardo Margàin Zozaya #325,<br>Colonia del Valle Campestre,<br>Garza García, Nuevo León, Mexico 66265, | DATE STAMP: |
| Defendant. | |

## COMPLAINT

Plaintiff United States of America ("United States"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable and other relief against defendant Cemex, S.A.B. de C.V. ("Cemex") to prevent its proposed acquisition of Rinker Group Limited ("Rinker"). Plaintiff complains and alleges as follows:

## I.    NATURE OF THE ACTION

1.    On October 27, 2006, Cemex Australia Pty Ltd., an entity controlled by Cemex, initiated a hostile cash tender offer to acquire all of the outstanding shares of Rinker. This offer was due to expire on March 30, 2007, but Cemex extended it until April 27, 2007. The total enterprise value of the transaction, including Rinker's debt, is approximately $12 billion.

2.    Cemex and Rinker both produce and distribute building materials, including, among other things, ready mix concrete, aggregate, and concrete block, throughout the world.

3.    The combination of Cemex and Rinker would create one of the world's largest building materials companies. Cemex's proposed acquisition of Rinker would reduce the number of significant suppliers of ready mix concrete in various metropolitan areas in Florida and Arizona, of concrete block in several metropolitan areas in Florida, and of aggregate in Tucson, Arizona.

4.    The United States brings this action to prevent the proposed acquisition because it would substantially lessen competition in the production and distribution of ready mix concrete in the metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, Fort Myers/Naples, Florida, and the metropolitan areas of Flagstaff and Tucson, Arizona. In addition, the acquisition would substantially lessen competition in the production and distribution of concrete block in metropolitan Tampa/St. Petersburg and Fort Myers/Naples, Florida. Finally, the acquisition would substantially lessen competition in the production and distribution of aggregate in metropolitan Tucson, Arizona.

## II.    PARTIES TO THE PROPOSED TRANSACTION

5.    Defendant Cemex is organized under the laws of the United Mexican States with its principal place of business in Nuevo León, Mexico. Cemex operates in the United States through its wholly owned subsidiary, Cemex, Inc., which has its principal place of business in Houston, Texas. In 2006, Cemex reported total sales of approximately $24.6 billion.

6.    Cemex produces and distributes cement, ready mix concrete, aggregate, concrete block, concrete pipe, and related building materials to customers in more than 50 countries. Approximately 25 percent of Cemex's revenues are earned in the United States. Cemex is the

largest United States supplier of ready mix concrete and cement and the seventh largest United States supplier of aggregate.

7.     Rinker is organized under the laws of Australia with its principal place of business in Chatswood, Australia. Rinker operates in the United States through its subsidiary, Rinker Materials Corporation. Rinker Materials Corporation has its principal place of business in West Palm Beach, Florida. In 2006, Rinker reported total sales of approximately $4 billion.

8.     Rinker produces and distributes aggregate, ready mix concrete, cement, concrete block, asphalt, concrete pipe, and other construction materials through its operations in the United States and Australia. Approximately 80 percent of Rinker's revenues are earned in the United States. Rinker is the second largest United States supplier of ready mix concrete and the fifth largest United States supplier of aggregate.

## III.     JURISDICTION AND VENUE

9.     Plaintiff United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Cemex from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

10.     Defendant produces and distributes ready mix concrete, concrete block, and aggregate in the flow of interstate commerce. Defendant's activities in producing and distributing these products substantially affect interstate commerce. This Court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(d). Further, Cemex has consented to venue and personal jurisdiction in this judicial district.

## IV.    TRADE AND COMMERCE

### A.    The Relevant Product Markets

#### 1.    Ready Mix Concrete

12.    Ready mix concrete is a building material made up of a combination of cement, fine and coarse aggregate, small amounts of chemical additives, and water. The amount of cement added to a concrete mixture determines its strength, which is measured in pounds per square inch ("psi"). Concrete with higher psi ratings is typically used for large state department of transportation highway and bridge projects and high-rise buildings. Concrete with lower psi ratings is typically used for residential and curb-and-gutter construction projects.

13.    Ready mix concrete is made at production facilities called batch plants. A batch plant measures the precise amount of dry input products needed to manufacture a given type of concrete. The mixture is then dumped into a rotating drum mounted on a heavy duty truck. Immediately before the truck departs the plant, a measured amount of water is added. Once the water hits the dry mixture, an irreversible chemical reaction is triggered causing the product to begin to set into a rigid building substance. The concrete components are mixed by the rotating drum while the truck is being driven to the job site. At the job site, the concrete is poured directly from the truck onto the project.

14.    Ready mix concrete is unique because it is pliable when freshly mixed, can be molded into a variety of forms, and it is strong and permanent when hardened. For many building applications, customers will not substitute other building materials, such as steel, wood, or asphalt, for ready mix concrete. Steel is often not a substitute for ready mix concrete because it cannot be poured and formed into smooth, regular planes. Wood is often not a substitute

4

because it does not have the structural strength to support heavy loads. Asphalt is often not a substitute because it cannot be used for the structural portions of bridges, cannot be used for buildings, and for certain applications cannot be used for highways.

15.    Ready mix concrete is sold pursuant to bids, which are based on extensive specifications from the customer regarding, among other things, the amount of concrete, the various strengths of concrete, and the size and timing of the concrete pours. The needs of the customer can differ significantly by each project.

16.    Not all suppliers of ready mix concrete can service every kind of project. For example, servicing certain types of "large projects," such as large state department of transportation highway and bridge building projects and high-rise building projects, requires ready mix concrete suppliers to be able to provide: (a) a large number of cubic yards of concrete; (b) large daily pours of concrete, which require the concrete supplier to schedule trucks to arrive continuously at a project; (c) concrete having multiple psi specifications; and (d) testing to insure the concrete meets project engineering specifications.

17.    If the concrete does not meet the project specifications or the concrete is not poured continuously, the customer may suffer substantial direct and consequential losses as a result of defective concrete. Contractors building large projects carefully select suppliers to minimize the chances of problems with the concrete.

18.    Purchasers of ready mix concrete for such large projects require that their suppliers have: (a) multiple ready mix concrete plants in a geographic area; (b) the ability to produce large amounts of concrete with multiple specifications; (c) backup plants; (d) a large number of concrete trucks; (e) a sizeable and well-trained workforce; (f) the demonstrated ability

5

to service such a large project; and (g) considerable financial backing to remedy any problems relating to defective concrete.

19.     Each large project is bid separately and ready mix concrete suppliers can identify the specific market conditions that apply to each large project, including the number of competitors that potentially could service the project's requirements.  Ready mix concrete suppliers can and do charge different prices to customers based on the particular project's requirements and the market conditions.

20.     A small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete without the characteristics described in paragraph 18 above with sufficient frequency so as to make such a price increase unprofitable.

21.     Accordingly, the production, distribution, and sale of ready mix concrete for use in large projects is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

## 2.     Concrete Block

22.     Concrete block is a construction material used to build exterior and interior walls in residential and commercial structures.  Concrete block comes in a variety of shapes and sizes. Standard concrete blocks measure 8 inches by 8 inches by 16 inches and are composed of two hollow squares joined to form a rectangle.

23.    Concrete block is produced by pouring concrete into molds and pressing the molded blocks onto a conveyor belt for transport to a kiln for curing. Concrete blocks are then delivered to storage yards for final hardening and storage.

24.    In Florida, from Orlando south, the walls of residential structures are built almost exclusively with concrete block. Wood is not a viable substitute because of its susceptibility to termite and hurricane damage. Poured concrete walls ("tilt up" walls) are at least 10 percent more expensive than concrete block, except where a large number of identical structures with regular shapes are built on contiguous lots using a single mold. In addition, block made of polyurethane is not an economically viable substitute because it is difficult to install and does not withstand hurricane winds as well as concrete block.

25.    For nearly all residential construction applications in Florida, from Orlando south, a small but significant post-acquisition increase in the price of concrete block would not cause the purchasers of concrete block to substitute another product in sufficient quantities so as to make such a price increase unprofitable.

26.    Accordingly, within the state of Florida, from Orlando south, the production and distribution of concrete block is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### 3.    Aggregate

27.    Aggregate is rock mined from either quarries or pits. Aggregate is crushed, washed, and mixed with sand, cement, and water to produce ready mix concrete. It is also used to make asphalt concrete for use in building roads. Different sizes of rock are needed to meet different ready mix concrete and asphalt specifications.

28.    There are no substitutes for aggregate because aggregate differs from other types of stone products in its physical composition, functional characteristics, customary uses, and pricing. It must meet the state departments of transportation or American Society of Testing Materials' specifications for the specific type of asphalt or ready mix concrete being produced.

29.    A small but significant post-acquisition increase in the price of aggregate that meets state departments of transportation and American Society of Testing Materials' specifications for use in ready mix concrete and asphalt projects would not cause the purchasers of such aggregate to substitute another product in sufficient quantities so as to make such a price increase unprofitable.

30.    Accordingly, the production and distribution of aggregate that meets state departments of transportation and American Society of Testing Materials' specifications for use in ready mix concrete and asphalt projects is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**B.    The Relevant Geographic Markets**

**1.    Ready Mix Concrete**

31.    The ready mix concrete needed for large projects, such as highways, bridges, and high-rise buildings, is bid on a project-by-project basis. Ready mix concrete suppliers can identify the specific market conditions that apply to each project, including the number of competitors that potentially could service the location of the project. Ready mix concrete suppliers charge different prices to customers based on the particular location of a project.

32.    The suppliers with the ability to bid on large projects are those with plants located within the metropolitan area in which the project is located. The cost of transporting ready mix

8

concrete is high compared to the value of the product. As concrete is hauled greater distances, the transportation costs begin to diminish the profitability of a load of concrete. Therefore, suppliers attempt to stay close to their batch plants to minimize the cost of hauling concrete.

33.    Further, because concrete begins to set while being driven to the job site, it is highly perishable. Therefore, contractors and state departments of transportation typically limit the time concrete can spend in a truck to 90 minutes or less. This time may be even shorter in hot weather conditions. This time period is measured from the moment the water hits the dry concrete inputs in the truck until the concrete is poured out of the truck. Because of this 90-minute window, contractors and state departments of transportation typically allow only a portion—often only 30 minutes—to be consumed by driving time. If the concrete is driven for a longer period of time, there may be insufficient time for the concrete to be completely poured onto the project within the 90-minute window.

34.    Due to its perishability and the cost of hauling concrete, depending on the size of the city and the associated traffic, the distance concrete can reasonably be transported for large projects, such as highways, bridges, and high-rise buildings in a metropolitan area is limited to the metropolitan area and, in many cases, to only portions of that area.

35.    The relevant geographic markets, within the meaning of Section 7 of the Clayton Act, consist of the locations within the metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, Fort Myers/Naples, Florida, and the metropolitan areas of Flagstaff and Tucson, Arizona, to which Cemex and Rinker are among a small number of firms that compete to supply ready mix concrete for large projects.

9

### 2.    Concrete Block

36.    The cost of transporting concrete block is high compared to the value of the product. Manufacturers or third-party haulers deliver concrete block to customer job sites by truck. As delivery distance increases, the ratio of transportation costs to the price of concrete block increases. In urban areas, this most often confines the transport of concrete block to the metropolitan area.

37.    A small but significant post-acquisition increase in the price of concrete block in metropolitan Tampa/St. Petersburg would not cause customers of concrete block to procure concrete block from outside this area in sufficient quantities so as to make such a price increase unprofitable.

38.    Accordingly, metropolitan Tampa/St. Petersburg is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

39.    Similarly, a small but significant post-acquisition increase in the price of concrete block in metropolitan Fort Myers/Naples would not cause customers of concrete block to procure concrete block from outside this area so as to make such a price increase unprofitable.

40.    Accordingly, metropolitan Fort Myers/Naples is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

### 3.    Aggregate

41.    Aggregate is a bulky, heavy, and relatively low-cost product. The cost of transporting aggregate is high compared to the value of the product.

42.    Suppliers cannot economically transport aggregate to the Tucson area from locations outside of metropolitan Tucson. First, transportation costs limit the distance aggregate

10

can be economically transported from an aggregate pit to a ready mix concrete plant (for aggregate pits that are not co-located with ready mix concrete plants) or from an aggregate pit to the job site. Second, the location of other aggregate suppliers limits the distance that aggregate can economically travel. Finally, in metropolitan Tucson, the ready mix concrete plants are typically co-located with the aggregate pits to minimize transportation costs.

43.    A small but significant post-acquisition increase in the price of aggregate in metropolitan Tucson would not cause customers of aggregate to procure aggregate in sufficient quantities from outside this area so as to make such a price increase unprofitable.

44.    Accordingly, metropolitan Tucson is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

C.    **Anticompetitive Effects**

1.    **The Proposed Transaction Will Harm Competition in the Markets for Ready Mix Concrete, Concrete Block, and Aggregate in the Specified Geographic Markets.**

a.    **Ready Mix Concrete**

45.    Vigorous price competition between Cemex and Rinker in the production and sale of ready mix concrete has benefitted customers.

46.    The competitors that could constrain Cemex and Rinker from raising prices for ready mix concrete to be used on large projects, such as highways, bridges, and high-rise buildings, are limited to those that meet the requirements imposed by purchasers for large ready mix concrete projects.

47.    The proposed acquisition will eliminate the competition between Cemex and Rinker and reduce the number of suppliers of ready mix concrete that might bid on certain types

of large projects, such as highways, bridges, and high-rise buildings, from three to two in metropolitan Tampa/St. Petersburg and metropolitan Fort Walton Beach/Panama City/Pensacola, Florida, and in metropolitan Tucson, Arizona. The proposed acquisition will eliminate the competition between Cemex and Rinker and reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects, such as highways, bridges and high-rise buildings, from four to three generally, and in some areas or for some projects from three to two, in metropolitan Orlando, metropolitan Fort Myers/Naples, and metropolitan Jacksonville, Florida. Further, the proposed acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of ready mix concrete to a significant number of customers in these areas.

48.     In metropolitan Flagstaff, Arizona, the proposed acquisition will eliminate the competition between Cemex and Rinker and reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects, such as highways, bridges, and high-rise buildings, from two to one.

49.     The response of other ready mix concrete producers in the relevant areas would not be sufficient to constrain a unilateral exercise of market power by Cemex after the acquisition.

50.     In addition, a combined Cemex and Rinker would have the ability to increase prices for ready mix concrete to certain customers. Ready mix concrete producers know the locations of their competitors' batch plants and the distance from their own plants and their competitors' plants to a customer's job site. Generally, because of transportation costs, the farther a supplier's closest competitor is from a job site, the less price competition that supplier

12

faces for that project. Post-acquisition, in instances where Cemex and Rinker plants were the closest plants to a customer's project, the combined firm, using the knowledge of its competitors' plant locations, would be able to charge such customers higher prices in instances in which the next closest ready mix concrete supplier's plant is farther from the customer's project than were the Cemex and Rinker plants.

51.    Without the competitive constraint of competition between Cemex and Rinker, post-acquisition Cemex will have a greater ability to exercise market power by raising prices to customers for whom Rinker and Cemex were their closest and second-closest sources of ready mix concrete.

52.    Further, Cemex's elimination of Rinker as an independent competitor in the production and distribution of ready mix concrete is likely to facilitate anticompetitive coordination among the remaining producers that can bid on large projects in each relevant geographic market. Mixes of the same strength of concrete are relatively standard and homogeneous, and producers have access to information about competitors' output, capacity, and costs. Moreover, participants in ready mix concrete markets have successfully engaged in anticompetitive coordination in the past. Given these market conditions, eliminating one of the few ready mix concrete suppliers that can bid on large projects is likely to further increase the ability of the remaining competitors to successfully coordinate.

53.    The transaction will therefore substantially lessen competition in the market for ready mix concrete in the affected areas, which is likely to lead to higher prices for the ultimate consumers of such products, in violation of Section 7 of the Clayton Act.

### b.    Concrete Block

54.    Vigorous price competition between Cemex and Rinker in the production and sale of concrete block has benefitted customers.

55.    In metropolitan Tampa/St. Petersburg, Florida, the proposed acquisition will eliminate the competition between Cemex and Rinker. The acquisition will give Cemex control of approximately 60 percent of the concrete block capacity in metropolitan Tampa/St. Petersburg. The proposed acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of concrete block to a significant number of customers in metropolitan Tampa/St. Petersburg.

56.    In metropolitan Fort Myers/Naples, Florida, the proposed acquisition will eliminate the competition between Cemex and Rinker. The acquisition will give Cemex control of approximately 69 percent of the concrete block capacity in metropolitan Fort Myers/Naples. The proposed acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of concrete block to a significant number of customers in metropolitan Fort Myers/Naples.

57.    In addition, in each of these markets, a combined Cemex and Rinker would have the ability to increase prices for concrete block to certain customers. As with ready mix concrete, concrete block manufacturers know the locations of their competitors' plants and the distance from their own plants and their competitors' plants to a customer's job site. Generally, because of transportation costs, the farther a supplier's closest competitor is from the job site, the less price competition that supplier faces for that project. Post-acquisition, in instances where Cemex and Rinker plants were the closest plants to a customer's project, the combined firm, using the

knowledge of its competitors' plant locations, would be able to charge such customers higher prices in instances in which the next closest concrete block supplier's plant is farther from the customer's project than were the Cemex and Rinker plants.

58.     Without the constraint of competition between Cemex and Rinker, post-acquisition Cemex will have a greater ability to exercise market power by raising prices to customers for whom Rinker and Cemex were their closest and second-closest sources of concrete block supply.

59.     Further, Cemex's elimination of Rinker as an independent competitor in the production and distribution of concrete block is likely to facilitate anticompetitive coordination among the remaining concrete block producers in each relevant geographic market. Concrete block is a homogeneous commodity and producers have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating one of the few concrete block competitors is likely to further increase the ability of the remaining competitors to successfully coordinate.

60.     The response of other concrete block producers in the relevant areas would not be sufficient to constrain a unilateral exercise of market power by Cemex after the acquisition.

61.     The transaction will therefore substantially lessen competition in the market for concrete block, which is likely to lead to higher prices for the ultimate consumers of such products, in violation of Section 7 of the Clayton Act.

### c.     Aggregate

62.     Vigorous price competition between Cemex and Rinker in the production and sale of aggregate in metropolitan Tucson, Arizona has benefitted customers.

15

63.    In metropolitan Tucson, the proposed acquisition will eliminate the competition between Cemex and Rinker. The proposed acquisition will also reduce the number of significant suppliers of aggregate from five to four in the Tucson market generally and, depending on the location of the aggregate pit and the transportation costs, the number of suppliers could be reduced to as few as three or two. Further, the proposed acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of aggregate to a significant number of customers.

64.    Further, Cemex's elimination of Rinker as an independent competitor in the production and distribution of aggregate is likely to facilitate anticompetitive coordination among the remaining aggregate producers in Tucson. Aggregate is a homogeneous commodity and producers have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating one of the few aggregate competitors is likely to further increase the ability of the remaining competitors to successfully coordinate.

65.    The transaction will therefore substantially lessen competition in the market for aggregate, which is likely to lead to higher prices for the ultimate consumers of such products, in violation of Section 7 of the Clayton Act.

2.    **Entry is Not Likely to Deter the Exercise of Market Power.**

a.    **Ready Mix Concrete**

66.    Successful entry or expansion into the production and distribution of ready mix concrete for large projects is difficult, time-consuming, and costly. In order to be able to bid on large projects, such as highways, bridges, and high-rise buildings, it is not sufficient simply to be able to produce ready mix concrete. In order to bid on these large projects, a new entrant or an

16

existing producer must have multiple ready mix concrete plants in a geographic area, the ability

to produce large amounts of concrete with multiple specifications, backup plants, a large number

of concrete trucks, a sizeable and well-trained workforce, the demonstrated ability and reputation

to be able to service such a large project and considerable financial backing to remedy any

problems relating to defective concrete.

67.    In addition, opening a ready mix concrete batch plant in a metropolitan area is

difficult because of the need to acquire the land for the site of such a batch plant. The location of

a batch plant is very important because of the perishability of the ready mix concrete. In Florida,

batch plants typically require approximately three to five acres of land to comply with

environmental and land use regulations. Finding the appropriate site for such a plant close

enough to the large projects is difficult, because in metropolitan areas such land is already

utilized or does not have the appropriate zoning. Obtaining the land use permits or zoning

variances is difficult, costly, and time-consuming, as well. Furthermore, in addition to building

the new batch plant, an entrant would also have to secure sources of cement and aggregate, which

are inputs into ready mix concrete.

68.    Therefore, entry or expansion by any other firm so that it is able to bid on large

ready mix concrete projects will not be timely, likely, or sufficient to defeat an anticompetitive

price increase.

### b.    Concrete Block

69.    In metropolitan Tampa/St. Petersburg and metropolitan Fort Myers/Naples,

successful entry or expansion into the production and distribution of concrete block is difficult,

time consuming, and costly. Properly zoned parcels of land of the necessary size (at least eight

acres) are scarce. Locating or securing proper zoning, development, building, air quality, and environmental permits and building a concrete block plant can take more than two years. Building a new concrete block plant costs approximately $8 to $12 million.

70.    Therefore, entry or expansion by any other firm into the concrete block markets in metropolitan Tampa/St. Petersburg and metropolitan Fort Myers/Naples will not be timely, likely, or sufficient to defeat an anticompetitive price increase.

### c.    Aggregate

71.    Successful entry or expansion into the production and distribution of aggregate is difficult, time-consuming, and costly. Successful entry or expansion into the production and distribution of aggregate in metropolitan Tucson, Arizona is difficult because there are very few new sites on which to locate aggregate pits. First, for aggregate used on transportation projects, the aggregate pits must be located in a river bed or wash. Second, aggregate is a finite resource in metropolitan Tucson, and several aggregate pits have been depleted in the past several years. Third, requests to open new aggregate pits often face fierce public opposition.

72.    In addition, Arizona state and federal zoning, air quality, and other permitting process requirements must be met. Obtaining the necessary environmental and land-use permits for aggregate pits is difficult in Tucson.

73.    Further, the Arizona Aggregate Mine Reclamation Act requires financial assurances and other requirements for companies seeking to open a new aggregate pit, continuing to operating an existing aggregate pit, or expanding an existing aggregate pit.

74.    Therefore, entry or expansion by any other firm into the aggregate market in

18

metropolitan Tucson would not be timely, likely, or sufficient to defeat an anticompetitive price increase.

## V.     VIOLATIONS ALLEGED

75.    The proposed acquisition of Rinker by Cemex would substantially lessen competition and tend to create a monopoly in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

76.    Unless restrained, the transaction will have the following anticompetitive effects, among others:

      a.     actual and potential competition between Cemex and Rinker in the production and distribution of ready mix concrete, concrete block, and aggregate in the relevant geographic markets will be eliminated;

      b.     competition generally in the production and distribution of ready mix concrete, concrete block, and aggregate in the relevant geographic markets will be substantially lessened;  and

      c.     prices for ready mix concrete, concrete block, and aggregate in the relevant geographic markets will likely increase.

## VI.    REQUEST FOR RELIEF

77.    Plaintiff requests that:

      a.     Cemex's proposed acquisition of Rinker be adjudged and decreed to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

      b.     defendant and all persons acting on its behalf be permanently enjoined and restrained from consummating the proposed acquisition or from entering

into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Cemex with the operations of Rinker;

c.   plaintiff be awarded its costs for this action; and

       d.     plaintiff receive such other and further relief as the Court deems just and

proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


_____
Thomas O. Barnett
Assistant Attorney General
D.C. Bar #426840

_____
Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar #435204


_____
David L. Meyer
Deputy Assistant Attorney General
D.C. Bar #414420

_____
Dorothy B. Fountain
Assistant Chief, Litigation II Section
D.C. Bar #439469


_____
Patricia A. Brink
Deputy Director of Operations

_____
Frederick H. Parmenter
Christine A. Hill (D.C. Bar #461048/inactive)
Leslie Peritz
John Lynch
James S. Yoon (D.C. Bar #491309)
Nicole Mark
Helena Joly
Attorneys
U.S. Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W.
Suite 3000
Washington, D.C.  20530
Tel:  (202) 307-0924


Dated: April 4, 2007

21

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Cemex, S.A.B. de C.V. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)   Nuevo Leon, Mex.
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Frederick H. Parmenter, Esq.
U.S. Department of Justice, Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530
(202) 307-0924

ATTORNEYS (IF KNOWN)

John E. Beerbower, Esq.
Cravath, Swain & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, N.Y. 10019
(212) 474-1864

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

⊙ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**⊙ A. Antitrust**

[X] 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E. General Civil (Other)        OR        ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

⊙ **1 Original Proceeding**  ○ **2 Removed from State Court**  ○ **3 Remanded from Appellate Court**  ○ **4 Reinstated or Reopened**  ○ **5 Transferred from another district (specify)**  ○ **6 Multi district Litigation**  ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Section 15 of the Clayton Act, 15 U.S.C. Section 25; Section 7 of the Clayton Act, 15 U.S.C. Section 18

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ [          ]  Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  April 4, 2007    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.