## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CEMEX, S.A.B. de C.V. and<br>RINKER GROUP LIMITED,<br><br>Defendants. | CASE NO.: 1:07-cv-00640<br><br>JUDGE: Hon. Royce C. Lamberth<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMPED: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.     NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on April 4, 2007, seeking to obtain equitable and other relief against defendant Cemex, S.A.B. de C.V. ("Cemex") to prevent its proposed acquisition of defendant Rinker Group Limited ("Rinker") by hostile cash tender offer. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially in the production and distribution of ready mix concrete in certain areas of Florida and Arizona, of concrete block in certain areas of Florida, and of aggregate in Tucson, Arizona, in violation of Section 7 of the Clayton Act. This loss of competition would likely result in

higher prices for these products in the affected areas. At the same time the Complaint was filed, the United States filed a Hold Separate Stipulation and Order and a proposed Final Judgment, which were designed to eliminate the anticompetitive effects of the acquisition.

Subsequently, on April 9, 2007, Cemex signed an agreement with Rinker, pursuant to which, among other things, Cemex agreed to increase its offer price for the shares of Rinker stock and the Rinker Board of Directors agreed to recommend to its shareholders that they accept Cemex's increased offer. Accordingly, on May 2, 2007, the United States filed an Amended Complaint adding Rinker as a defendant and an Amended Hold Separate Stipulation and Order that obligated Rinker to abide by the terms of that Stipulation and Order.[1] Finally, the United States filed an amended proposed Final Judgment (hereafter, the "proposed Final Judgment"), reflecting the fact that Rinker is a defendant in this action.[2]

Under the proposed Final Judgment, which is explained more fully below, Cemex is required to divest 31 ready mix concrete plants in the metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, and Fort Myers/Naples, Florida, and the metropolitan areas of Flagstaff and Tucson, Arizona. In addition, Cemex is required to divest six concrete block plants in the Tampa/St. Petersburg and Fort Myers/Naples, Florida metropolitan areas and two aggregate plants in the Tucson, Arizona

---

[1]    Paragraph VIII(B) of the original proposed Final Judgment provided that if Cemex and Rinker subsequently reached an agreement relating to Cemex's acquisition of Rinker, Cemex would require Rinker to sign and become a party to an amended Hold Separate Stipulation and Order.

[2]    In addition, Paragraph VIII (B) of the original proposed Final Judgment was deleted in the amended Final Judgment because Rinker has been added to the Amended Hold Separate Stipulation and Order. There were no other substantive changes to the Amended Complaint or amended proposed Final Judgment.

2

metropolitan area. Under the terms of the Amended Hold Separate Stipulation and Order, Cemex and Rinker are required to: (1) take certain steps to ensure that the plants discussed above (hereafter, the "Divestiture Assets") are operated as ongoing, economically viable competitive businesses; (2) maintain the management, sales, and operations of all assets owned by each entirely separate, distinct, and apart from the assets owned by the other; and (3) refrain from coordinating the production, marketing, or terms of sale of any of their products with those produced or distributed by any assets owned by the other defendant prior to the acquisition.

The United States, Cemex, and Rinker have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.     **DESCRIPTION OF THE EVENTS
        GIVING RISE TO THE ALLEGED VIOLATION**

A.     *The Defendants and the Proposed Transaction*

Cemex and Rinker both produce and distribute building materials, including, among other things, ready mix concrete, aggregate, and concrete block throughout the world. Cemex is organized under the laws of the United Mexican States with its principal place of business in Nuevo León, Mexico. In 2006, Cemex reported total sales of approximately $24.6 billion. Cemex is the largest United States supplier of ready mix concrete and cement and the seventh largest United States supplier of aggregate. Approximately 25 percent of Cemex's revenues are earned in the United States. Cemex operates in the United States through its wholly-owned subsidiary, Cemex, Inc., which has its principal place of business in Houston, Texas.

3

Rinker is organized under the laws of Australia with its principal place of business in Chatswood, Australia. In 2006, Rinker reported total sales of approximately $4 billion. Rinker is the second largest United States supplier of ready mix concrete and the fifth largest United States supplier of aggregate. Approximately 80 percent of Rinker's revenues are earned in the United States. Rinker operates in the United States through its subsidiary, Rinker Materials Corporation. Rinker Materials Corporation has its principal place of business in West Palm Beach, Florida.

On October 27, 2006, Cemex Australia Pty Ltd., an entity controlled by Cemex, initiated a hostile cash tender offer to acquire all of the outstanding shares of Rinker for $13 per share. The total enterprise value of the transaction when made on October 27, 2006, including Rinker's debt, was approximately $12 billion. This offer was due to expire on March 30, 2007, but Cemex extended it until April 27, 2007.

On April 9, 2007, Cemex announced that it signed an agreement with Rinker, pursuant to which Cemex agreed to increase its offer price for the shares of Rinker stock to $15.85 per share. This increased the total enterprise value of the transaction to approximately $15 billion. This offer expires on May 18, 2007, and is subject to Cemex's acquisition of 90 percent of the Rinker shares. As part of the agreement, the Rinker Board of Directors unanimously agreed to recommend to its shareholders that they accept Cemex's increased offer in the absence of a superior proposal.

B.     *The Competitive Effects of the Transaction on the Markets for Ready Mix Concrete, Concrete Block, and Aggregate*

1.     *Relevant Product Markets*

a.     *Production, Distribution, and Sale of Ready Mix Concrete*

The Amended Complaint alleges that the production, distribution, and sale of ready mix concrete for use in large projects is a relevant product market within the meaning of Section 7 of the Clayton Act. Ready mix concrete is a building material made up of a combination of cement, fine and coarse aggregate, small amounts of chemical additives, and water. Ready mix concrete is unique because it is pliable when freshly mixed, can be molded into a variety of forms, and is strong and permanent when hardened. For many building applications, there is no substitute for ready mix concrete.

Ready mix concrete is sold pursuant to bids, which are based on extensive specifications from the customer regarding, among other things, the amount of concrete, the various strengths of concrete, and the size and timing of the concrete pours. Not all suppliers of ready mix concrete can service every kind of project. For example, servicing certain types of large projects, such as large state department of transportation highway and bridge building projects and high-rise building projects, requires ready mix concrete suppliers to be able to provide: (a) a large number of cubic yards of concrete; (b) large daily pours of concrete, which require the concrete supplier to schedule trucks to arrive continuously at a project; (c) concrete having multiple pounds per square inch specifications; and (d) tests to ensure that the concrete meets project engineering specifications. If the concrete does not meet the project specifications or the concrete is not poured continuously, the customer may suffer direct and consequential losses as a result of defective concrete. Purchasers of ready mix concrete for such large projects require that

5

the suppliers have: (a) multiple ready mix concrete plants in a geographic area; (b) the ability to produce large amounts of concrete with multiple specifications; (c) backup plants; (d) a large number of concrete trucks; (e) a sizeable and well-trained workforce; (f) the demonstrated ability to service such a large project; and (g) considerable financial backing to remedy any problems relating to defective concrete.

Each large project is bid separately and ready mix concrete suppliers can identify the specific market conditions that apply to each large project, including the number of competitors that potentially could service the project's requirements. Ready mix concrete suppliers can and do charge different prices to customers based on the particular project's requirements and market conditions.

The Amended Complaint alleges that a small but significant post-acquisition increase in the price of ready mix concrete that meets particular bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete without the characteristics described above with sufficient frequency, so as to make such a price increase unprofitable. Accordingly, the production, distribution, and sale of ready mix concrete for use in large projects is a line of commerce and a relevant product market.

### b.    *Concrete Block*

The Amended Complaint alleges that concrete block is a relevant product market within the meaning of Section 7 of the Clayton Act in the state of Florida from Orlando south. Concrete block is a construction material used to build exterior and interior walls in residential and commercial structures. In the state of Florida, from Orlando south, the walls of residential structures are built almost exclusively with concrete block. For nearly all residential construction

6

applications in this area, a small but significant post-acquisition increase in the price of concrete block would not cause the purchasers of concrete block to substitute another product such as poured concrete or polyurethane block in sufficient quantities so as to make such a price increase unprofitable. Accordingly, within the state of Florida, from Orlando south, concrete block is a relevant product market.

        *c.*     *Aggregate*

      The Amended Complaint alleges that the production and distribution of aggregate that meets specifications set by state departments of transportation and the American Society of Testing Materials for use in ready mix concrete and asphalt projects is a relevant product market within the meaning of Section 7 of the Clayton Act. Aggregate is rock mined from either quarries or pits that is crushed, washed, and mixed with sand, cement, and water to produce ready mix concrete. It is also used to make asphalt concrete for use in building roads. Different sizes of rock are needed to meet different concrete and asphalt specifications. There are no substitutes for aggregate because it differs from other types of stone products in its physical composition, functional characteristics, customary uses, and pricing. It must meet specifications of state departments of transportation or the American Society of Testing Materials for the specific type of asphalt or ready mix concrete being produced. The Amended Complaint further alleges that a small but significant post-acquisition increase in the price of aggregate that meets such specifications for use in ready mix concrete and asphalt projects would not cause the purchasers of aggregate to substitute another product in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the production and distribution of aggregate that meets specifications of state departments of transportation or the American Society of Testing Materials for use in ready mix concrete and asphalt projects is a relevant product market.

7

2.     *Relevant Geographic Markets*

a.     *Ready Mix Concrete*

The ready mix concrete needed for large projects, such as highways, bridges, and high-rise buildings, is bid on a project-by-project basis. Ready mix concrete suppliers can identify the specific market conditions that apply to each project, including the number of competitors that potentially could service the location of the project. Ready mix concrete suppliers charge different prices to customers based on the particular location of a project.

The suppliers with the ability to bid on large projects are those with plants located within the metropolitan area in which the project is located. The cost of transporting ready mix concrete is high compared to the value of the product. As concrete is hauled greater distances, the transportation costs begin to diminish the profitability of a load of concrete. Therefore, suppliers attempt to stay close to their batch plants to minimize the cost of hauling concrete.

Further, because concrete begins to set while being driven to the job site, it is highly perishable. Therefore, contractors and state departments of transportation typically limit the time concrete can spend in a truck to 90 minutes or less. Of this 90-minute window, contractors and state departments of transportation typically allow only a portion–often only 30 minutes–to be consumed by driving time.

Due to its perishability and the cost of hauling concrete, depending on the size of the city and the associated traffic, the distance concrete can reasonably be transported for large projects, such as highways, bridges, and high-rise buildings in a metropolitan area, is limited to the metropolitan area and, in many cases, to only portions of that area. Accordingly, the relevant markets consist of the locations within the metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, and Fort Myers/Naples, Florida,

and the metropolitan areas of Flagstaff and Tucson, Arizona, to which Cemex and Rinker are among a small number of firms that compete to supply ready mix concrete.

<em>b.</em>    <em>Concrete Block</em>

The cost of transporting concrete block is high compared to the value of the product. Manufacturers or third-party haulers deliver concrete block to customer job sites by truck. As delivery distance increases, the ratio of transportation costs to the price of concrete block increases. In urban areas, this ratio most often confines the transport of concrete block to the metropolitan area.

The Amended Complaint alleges that a small but significant post-acquisition increase in the price of concrete block in either the metropolitan Tampa/St. Petersburg area or the metropolitan Fort Myers/Naples area would not cause customers of concrete block to procure concrete block from outside these areas in sufficient quantities so as to make such a price increase unprofitable. Accordingly, metropolitan Tampa/St. Petersburg and metropolitan Fort Myers/Naples are relevant geographic markets.

<em>c.</em>    <em>Aggregate</em>

Aggregate is a bulky, heavy, and relatively low-cost product. The cost of transporting aggregate is high compared to the value of the product. Suppliers cannot economically transport aggregate to the Tucson area from locations outside of metropolitan Tucson. First, transportation costs limit the distance aggregate can be economically transported from an aggregate pit to a ready mix concrete plant (for aggregate pits that are not co-located with ready mix concrete plants) or from an aggregate pit to the job site. In metropolitan Tucson, the ready mix concrete

plants are typically co-located with the aggregate pits to minimize transportation costs. Second, the location of other aggregate suppliers limits the distance that aggregate can economically travel.

The Amended Complaint alleges that a small but significant post-acquisition increase in the price of aggregate in metropolitan Tucson would not cause customers of aggregate to procure aggregate in sufficient quantities from outside this area so as to make such a price increase unprofitable. Accordingly, metropolitan Tucson is a relevant geographic market.

       3.       *Anticompetitive Effects of the Acquisition*

              a.      *Ready Mix Concrete*

The Amended Complaint alleges that the proposed acquisition will eliminate competition between Cemex and Rinker and reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects, such as highways, bridges, and high-rise buildings, from three to two in metropolitan Tampa/St. Petersburg and metropolitan Fort Walton Beach/Panama City/Pensacola, Florida, and in metropolitan Tucson, Arizona. The proposed acquisition will eliminate the competition between Cemex and Rinker and reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects, such as highways, bridges, and high-rise buildings, from four to three generally, and in some areas or for some projects from three to two, in metropolitan Orlando, metropolitan Fort Myers/Naples, and metropolitan Jacksonville, Florida. Accordingly, the Amended Complaint alleges that the proposed acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of ready mix concrete to a significant number of customers in the affected metropolitan

areas. Moreover, in metropolitan Flagstaff, Arizona, the proposed acquisition will reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects, such as highways, bridges, and high-rise buildings, to only one.

Absent the constraint of competition between Cemex and Rinker, post-acquisition Cemex will have a greater ability to exercise market power by raising prices to customers for whom Rinker and Cemex were their closest and second-closest sources of ready mix concrete. The responses of other ready mix concrete producers in the relevant areas would not be sufficient to constrain a unilateral exercise of market power by Cemex after the acquisition.

Further, Cemex's elimination of Rinker as an independent competitor in the production and distribution of ready mix concrete is likely to facilitate anticompetitive coordination among the remaining producers that can bid on large projects in each relevant geographic market. Mixes of the same strength of concrete are relatively standard and homogeneous, and producers have access to information about competitors' output, capacity, and pricing. Moreover, participants in ready mix markets have successfully engaged in anticompetitive coordination in the past. Given these market conditions, eliminating one of the few ready mix concrete suppliers that can bid on large projects is likely to increase further the ability of the remaining competitors to coordinate successfully.

Successful entry or expansion into the production and distribution of ready mix concrete for large projects is difficult, time-consuming, and costly. In order to be able to bid on large projects, such as highways, bridges, and high-rise buildings, it is not sufficient simply to be able to produce ready mix concrete. A new entrant or an existing producer must have multiple ready mix concrete plants in a geographic area, the ability to produce large amounts of concrete with multiple specifications, backup plants, a large number of concrete trucks, a sizeable and well-

trained workforce, the demonstrated ability and reputation to be able to service such a large project, and considerable financial backing to remedy any problems relating to defective concrete.

In addition, opening a ready mix concrete batch plant in a metropolitan area is difficult because of the need to acquire the land for the site of such a batch plant. The location of a batch plant is important because of the perishability of the ready mix concrete. In Florida, batch plants typically require approximately three to five acres of land to comply with environmental and land use regulations. Finding the appropriate site for such a plant close enough to the large projects is difficult, because in metropolitan areas such land is already utilized or does not have the appropriate zoning. Obtaining the land use permits or zoning variances is difficult, costly, and time-consuming, as well. Furthermore, in addition to building the new batch plant, an entrant would also have to secure sources of cement and aggregate, which are inputs into ready mix concrete. Accordingly, entry or expansion by any other firm so that it is able to bid on large ready mix concrete projects will not be timely, likely, or sufficient to deter an anticompetitive price increase by Cemex after the acquisition.

<em>b.    Concrete Block</em>

In metropolitan Tampa/St. Petersburg and metropolitan Fort Myers/Naples, Florida, the acquisition will eliminate competition between Cemex and Rinker. The acquisition will give Cemex control of approximately 60 percent of the concrete block capacity in metropolitan Tampa/St. Petersburg, and approximately 69 percent of the concrete block capacity in metropolitan Fort Myers/Naples. The acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of concrete block to a significant number of customers in metropolitan Tampa/St. Petersburg and metropolitan Naples/Fort Myers. The responses of

12

other concrete block producers in the relevant areas would not be sufficient to constrain a unilateral exercise of market power by Cemex after the acquisition. In addition, without the constraint of competition between Cemex and Rinker, post-acquisition Cemex will have a greater ability to exercise market power by raising prices to customers for whom Rinker and Cemex were their closest and second-closest sources of concrete block supply.

Further, Cemex's elimination of Rinker as an independent competitor in the production and distribution of concrete block is likely to facilitate anticompetitive coordination among the remaining concrete block producers in each relevant geographic market. Concrete block is a homogeneous commodity and producers have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating one of the few concrete block competitors is likely to increase further the ability of the remaining competitors to coordinate successfully.

Moreover, in metropolitan Tampa/St. Petersburg and metropolitan Fort Myers/Naples, successful entry or expansion into the production and distribution of concrete block is difficult, time-consuming, and costly, and such entry would not be timely, likely, or sufficient to defeat an anticompetitive price increase in the event that Cemex acquires Rinker. Properly zoned parcels of land of the necessary size are scarce. Locating or securing proper zoning, development, building, air quality, and environmental permits and building a concrete block plant can take more than two years. Building a new concrete block plant costs approximately $8 to $12 million. Accordingly, entry or the threat of entry into the concrete block market is not likely to deter an anticompetitive price increase by Cemex after the acquisition.

c.      *Aggregate*

In metropolitan Tucson, the proposed acquisition will eliminate competition between Cemex and Rinker.  The proposed acquisition will also reduce the number of significant suppliers of aggregate from five to four in the market generally, and, in some locations for which the third or fourth most proximate supplier faces higher transportation costs than the nearest two, the number of suppliers could be reduced to as few as two or three.  The acquisition will substantially increase the likelihood that Cemex will unilaterally increase the price of aggregate to a significant number of customers.

Moreover, Cemex's elimination of Rinker as an independent competitor in the production and distribution of aggregate is likely to facilitate anticompetitive coordination among the remaining aggregate producers in Tucson.  Aggregate is a homogeneous commodity and producers have access to information about competitors' output, capacity, and costs.  Given these market conditions, eliminating one of the few aggregate competitors is likely to increase further the ability of the remaining competitors to coordinate successfully.

Further, in Tucson, successful entry or expansion into the production and distribution of aggregate is difficult, time-consuming, and costly, and such entry would not be timely, likely, or sufficient to defeat an anticompetitive price increase in the event that Cemex acquires Rinker. There are few new sites on which to locate aggregate pits in metropolitan Tucson.  First, for aggregate used on transportation projects, the aggregate pits must be located in a river bed or wash.  Second, aggregate is a finite resource in metropolitan Tucson and several aggregate pits have been depleted in the past several years.  Third, requests to open new aggregate pits often face fierce public opposition.  Fourth, obtaining the necessary environmental and land use

14

permits for aggregate pits is difficult in metropolitan Tucson. Fifth, the Arizona Aggregate Mine Reclamation Act requires financial assurances and other requirements for companies seeking to open a new aggregate pit, continuing to operate an existing pit, or expanding an existing pit. Accordingly, entry or the threat of entry into the aggregate market is not likely to deter an anticompetitive price increase by Cemex after the acquisition.

**III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

A.    *The Divestiture Assets*

The divestitures provided for in the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the markets for the production and distribution of: (1) ready mix concrete in the metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, and Fort Myers/Naples, Florida, and the metropolitan areas of Flagstaff and Tucson, Arizona; (2) concrete block in the metropolitan areas of Tampa/St. Petersburg and Fort Myers/Naples, Florida; and (3) aggregate in metropolitan Tucson, Arizona. In each metropolitan area for ready mix concrete, the divestitures will establish a new, independent, and economically viable competitor that can bid on large projects, such as highways, bridges, and high-rise buildings. In metropolitan Tampa/St. Petersburg and Fort Myers/Naples, the divestitures will also establish new, independent, and economically viable competitors that can produce and distribute concrete block in each metropolitan area. Further, the divestitures will provide the new ready mix concrete competitor in Tucson, Arizona, with sufficient aggregate reserves to compete effectively in that market.

15

The Divestiture Assets are:

A.    Ready Mix Concrete plants:

      1.    Fort Walton Beach/Panama City/Pensacola, Florida Area

          a.    Rinker's Crestview plant, located at 5420 Fairchild Road, Crestview, FL 32539;

          b.    Rinker's Fort Walton plant, located at 1787 FIM Boulevard, Fort Walton Beach, FL 32547;

          c.    Rinker's Milton plant, located at 6250 Da Lisa Road, Milton, FL 32583;

          d.    Rinker's Panama City plant, located at 1901-B East 15th Street, Panama City, FL 32405;

          e.    Rinker's Panama City Beach plant, located at 17750 Hutchinson Road, Panama City Beach, FL 32407;

          f.    Rinker's Pensacola plant, located at 415 Hyatt Street, Pensacola, FL 32503;

          g.    Rinker's Port St. Joe plant, located at 1145 Industrial Road, Port St. Joe, FL 32456;

          h.    Rinker's Point Washington plant, located at the intersection of East Highway 98 and Old Ferry Road, Santa Rosa Beach, FL 32459;

      2.    Jacksonville, Florida Area

          a.    Cemex's Main Street plant, located at 9214 North Main Street, Jacksonville, FL 32218;

16

          b.        Cemex's Southside Florida Mining Boulevard plant, located at 9715 East Florida Mining Boulevard, Jacksonville, FL 32223;

3.     Orlando, Florida Area

          a.        Cemex's East Orlando plant, located at 7400 Narcoossee Road, Orlando, FL 32822;

          b.        Cemex's Goldenrod plant, located at 4000 Forsyth Road, Winter Park, FL 32792;

          c.        Cemex's Winter Garden plant, located at 201 Hennis Road, Winter Garden, FL 34787;

          d.        Rinker's Kennedy plant, located at 1406 Atlanta Avenue, Orlando, FL 32806;

4.     Tampa/St. Petersburg, Florida Area

          a.        Rinker's Clearwater plant, located at 3757 118th Avenue North, Clearwater, FL 33762;

          b.        Rinker's Odessa plant, located at 12025 State Road 54, Odessa, FL 33556;

          c.        Rinker's Odessa Keys plant, located at 11913 State Road 54, Odessa, FL 33556;

          d.        Rinker's Riverview plant, located at 6723 South 78th Street, Riverview, FL 33569;

          e.        Rinker's Tampa plant, located at 6106 East Hanna Avenue, Tampa, FL 33610;

     f.      Rinker's Tampa Keys plant, located at 1811 North 57th Street, Tampa, FL 33619;

5.    Fort Myers/Naples, Florida Area

     a.      Rinker's Ave Maria plant, located at 4811 Ave Maria Boulevard, Immokalee, FL 34142;

     b.      Rinker's Bonita Springs plant, located at 25061 Old U.S. Highway 41 South, Bonita Springs, FL 34135;

     c.      Rinker's Canal Street plant, located at 4262 Canal Street, Fort Myers, FL 33916;

     d.      Rinker's Cape Coral (Pine Island) plant, located at 2401 SW Pine Island Road, Cape Coral, FL 33991;

     e.      Rinker's Naples plant, located at 9210 Collier Boulevard, Naples, FL 34114;

     f.      Rinker's South Fort Myers plant, located at 7270 Alico Road, Fort Myers, FL 33912;

6.    Flagstaff, Arizona Area

Cemex's Brannen plant, located at 633 East Brannen Avenue, Flagstaff, AZ 86001;

7.    Tucson, Arizona Area

     a.      Cemex's Ina plant, located at 5400 West Massingale Road, Tucson, AZ 85743;

      b.      Rinker's Green Valley plant, located at 18701 South Old Nogales Highway, Sahuarita, AZ 85629;

      c.      Rinker's Poorman Road plant, located at 6500 South Old Spanish Trail, Tucson, AZ 85747;

      d.      Rinker's Valencia plant, located at 1011 West Valencia Road, Tucson, AZ 85706;

B.      Concrete Block plants:

      1.      Tampa/St. Petersburg, Florida Area

            a.      Rinker's Odessa plant, located at 12025 State Road 54, Odessa, FL, 33556;

            b.      Rinker's Palmetto plant, located at 600 9th Street West, Palmetto, FL, 34221;

            c.      Rinker's Tampa plant, located at 6302 North 56th Street, Tampa, FL 33610;

      2.      Fort Myers/Naples, Florida Area

            a.      Rinker's Bonita Springs plant, located at 25091 Old U.S. Highway 41 South, Bonita Springs, FL 34135;

            b.      Rinker's Coral Rock plant, located at 41451 Cook Brown Road, Punta Gorda, FL 33982;

            c.      Rinker's South Fort Myers plant, located at 7270 Alico Road, Fort Myers, FL 33912;

C.    Aggregate plants:

    1.    Cemex's Ina plant, located at 5400 West Massingale Road, Tucson, AZ 85743; and

    2.    Rinker's Green Valley plant, located at 18701 South Old Nogales Highway, Sahuarita, AZ 85629.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will ensure that Cemex's acquisition does not harm competition in any of the affected geographic areas for ready mix concrete, concrete block, and aggregate. In the following geographic areas, Cemex is required to divest all of the ready mix concrete plants it would acquire from Rinker: Fort Walton Beach/Panama City/Pensacola, Tampa/St. Petersburg, and Fort Myers/Naples, Florida. In addition, in Tampa/St. Petersburg and Fort/Myers/Naples, Florida, Cemex is required to divest all of the concrete block plants it would acquire from Rinker. Further, in Flagstaff, Arizona, Cemex is required to divest its only ready mix concrete plant and will acquire only one ready mix concrete plant from Rinker.

In the other three metropolitan areas of concern, the proposed Final Judgment requires divestiture of a sufficient number of ready mix concrete plants to ensure that competition is preserved. In metropolitan Orlando, Florida, Cemex operates five plants and Rinker operates four plants. The proposed Final Judgment requires the divestiture of four plants: (1) three Cemex plants located northwest, northeast, and southeast of downtown Orlando; and (2) one Rinker plant located in downtown Orlando. With these four plants, the acquirer will be able to service large projects anywhere in metropolitan Orlando, and for each of the divested plants, another of those plants could serve as an effective back-up facility. The proposed Final

Judgment does not require the divestiture of Cemex's downtown facility because it is co-located with one of Rinker's two downtown facilities, and Cemex anticipates achieving efficiencies in raw material supply by retaining its plant and the downtown Rinker plant at the same location.

Within the Jacksonville, Florida, metropolitan area, Cemex currently operates three plants and Rinker operates four plants. The proposed Final Judgment requires the divestiture of two of Cemex's plants—one south of downtown and the other north. Together these two plants will be able to preserve pre-merger competition between Cemex and Rinker in Jacksonville. The proposed Final Judgment does not require the divestiture of Cemex's downtown plant because Rinker has no plant in the downtown area, and the two plants to be divested can service the downtown area as or more effectively than Rinker's plants. Moreover, Cemex's downtown facility is co-located with a concrete block plant that Cemex will retain and a divestiture of the ready mix concrete facilities at that location would not allow Cemex to achieve efficiencies related to the co-location.

In the Tucson, Arizona, metropolitan area, Cemex operates four ready mix concrete facilities and Rinker operates five. The proposed Final Judgment requires the divestiture of four ready mix concrete facilities: three Rinker facilities and one Cemex facility. This relief is adequate to preserve competition because it provides the acquirer with the same number of ready mix concrete facilities as Cemex operates and ensures that the acquirer will have access to supplies of aggregates needed to compete effectively. In particular, by requiring the divestiture of Cemex's Ina plant instead of one of Rinker's other two plants, and by separately requiring that all of the divested ready mix concrete plants be sold to the same acquirer that purchases Rinker's

aggregate facilities at Green Valley and Cemex's aggregate facilities at Ina, the proposed Final

Judgment will give the acquirer access to aggregates that is at least equivalent to that of Rinker.

     B.     *Selected Provisions of the Proposed Final Judgment*

     In antitrust cases involving mergers in which the United States seeks a divestiture

remedy, it requires completion of the divestiture within the shortest time period reasonable under

the circumstances.  A quick divestiture has the benefits of restoring competition lost in the

acquisition and reducing the possibility of dissipation of the value of the assets.  Paragraph IV(A)

of the proposed Final Judgment requires Cemex to divest the Divestiture Assets as viable

ongoing businesses within 120 days after the Divestiture Trigger,[3] or five days after notice of the

entry of the Final Judgment by the Court, whichever is later.  The Divestiture Trigger is the

earlier of two dates:  the date on which Cemex elects a majority of the Board of Directors of

Rinker, or 45 days after Cemex obtains a number of shares of Rinker stock in excess of 50

percent of the outstanding shares of Rinker.  The 120-day time period to effectuate the

divestitures begins to run from the Divestiture Trigger, rather than the filing of the Complaint,

because the deal originally involved a hostile, cash tender offer.  Cemex represented to the

United States that under Australian law, it could not effectuate the divestitures until it had

obtained in excess of 50 percent of the outstanding Rinker shares and had elected a majority of

Rinker's Board of Directors.  The Divestiture Trigger thus requires Cemex to start the 120-day

---

[3]     In this matter, the proposed Final Judgment provides that Cemex has 120 days after the Divestiture Trigger to accomplish the divestitures because they involve multiple geographic markets and several different types of assets.  During the period before Cemex effectuates the divestitures, the Amended Hold Separate Stipulation and Order will preserve the assets to be divested and require that each defendant continue to operate its assets separately from the other's assets, thereby maintaining competition.

clock as soon as it elects a majority of the Rinker Board and can effectuate the divestitures, while establishing an outer time limit of 45 days if Cemex obtains the majority of outstanding shares but delays electing a new Board.

Given that the proposed transaction is a tender offer, the proposed Final Judgment contains provisions to ensure that relief will be effective. Paragraph IV(J) of the proposed Final Judgment requires that Cemex divest all its interest in Rinker within six months from the date that the Final Judgment is signed by the Court if Cemex does not acquire a number of shares of Rinker stock in excess of 50 percent of the outstanding shares of Rinker. This provision ensures that if Cemex does not acquire a sufficient number of shares to effectuate the divestiture of the assets owned by Rinker prior to an acquisition by Cemex, then Cemex will not be permitted to own enough shares of Rinker to allow Cemex to have some form of control over Rinker even though it is unable to effectuate the divestitures.

In addition, if for any reason Cemex is unable to divest any of the Divestiture Assets or make those assets available for sale by the trustee, or if Cemex cannot warrant that the Divestiture Assets will be operational on the date of the divestiture and that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets, paragraph IV(H) provides that for each affected asset, the United States, in its sole discretion, may select one or more alternative assets owned by Cemex that are located in the same geographic area to be divested in lieu of the affected Divestiture Asset.[4] This provision is

---

[4]       Paragraph IV(H) does not apply to the Fort Walton Beach/Panama City/Pensacola area, where Cemex's ready mix concrete assets are owned and operated through a joint venture between Cemex and Ready Mix USA, Inc. Accordingly, Cemex is not able unilaterally to sell any of its ready mix concrete plants in that area and it would be extremely difficult and costly for Cemex to terminate its interest in the joint venture. The United States determined that the

necessary to protect against a variety of situations in which a Divestiture Asset owned by Rinker

prior to the acquisition by Cemex could not be divested.  This will ensure that each acquirer has

sufficient assets to be able to compete for the projects for which Cemex and Rinker currently

compete.

Further, paragraph IV(I) of the proposed Final Judgment provides that all the ready mix

concrete plants in a geographic area must be divested to a single acquirer, all the concrete block

plants in a geographic area must be divested to a single acquirer, and both aggregate plants in

Tucson must be divested to the same acquirer that purchases the Tucson-area divested ready mix

concrete plants.  This provision ensures that Cemex's acquisition does not harm competition in

the affected product and geographic markets.

Paragraph IV(I) of the proposed Final Judgment also provides that the assets must be

divested in such a way as to satisfy the United States in its sole discretion that the operations can

and will be operated by the purchaser as a viable, ongoing business that can compete effectively

in the relevant market.  Cemex must take all reasonable steps necessary to accomplish the

divestitures quickly and shall cooperate with prospective purchasers.

Finally, section V of the proposed Final Judgment provides that in the event that Cemex

does not accomplish the divestitures within the periods prescribed in the proposed Final

Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures.

If a trustee is appointed, the proposed Final Judgment provides that Cemex will pay all costs and

expenses of the trustee.  The trustee's commission will be structured so as to provide an incentive

---

benefit of requiring Cemex to terminate its interest in the joint venture or to make these assets
available for sale would be significantly outweighed by the negative impact on the joint venture,
which operates in a large number of areas that are unaffected by Cemex's acquisition of Rinker.

for the trustee based on the price obtained and the speed with which the divestitures are accomplished.  After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestitures.  If the divestitures have not been accomplished at the end of the six months, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> 1401 H St. N.W., Suite 3000
> Antitrust Division
> United States Department of Justice
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the proposed Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Cemex's acquisition of Rinker. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the production and distribution of ready mix concrete, concrete block, and aggregate in the markets identified by the United States and that such a remedy would achieve all or substantially all the relief the United States would have obtained through litigation, but avoids the time and expense of a trial.

26

VII.    **STANDARD OF REVIEW UNDER THE**
        **APPA FOR THE PROPOSED FINAL JUDGMENT**

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

(A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

27

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5]  In making its public interest

determination, a district court must accord due respect to the government's prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case. *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

Court approval of a final judgment requires a standard that is more flexible and less

strict than the standard required for a finding of liability. "[A] proposed decree must be

approved even if it falls short of the remedy the court would impose on its own, as long as it

falls within the range of acceptability or is 'within the reaches of public interest.'" *United States

v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United

States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v.

United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F.

Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would

have imposed a greater remedy).  The Court "must accord deference to the government's

predictions about the efficacy of its remedies, and may not require that the remedies perfectly

---

5       *Cf. BNS*, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

match the alleged violations because this may only reflect underlying weakness in the government's case or concessions made during negotiation." *United States v. SBC Commc'ns, Inc.*, Nos. 05-2102 and 05-2103, 2007 WL 1020746, at *16 (D.D.C. Mar. 29, 2007).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Commc'ns*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 2007 WL 1020746, at *14.

In 2004, Congress amended the APPA to ensure that courts take into account the above-quoted list of relevant factors when making a public interest determination. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms).

These amendments, however, did not change the fundamental role of courts in reviewing proposed settlements. To the contrary, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing

29

or to require the court to permit anyone to intervene." 15 U.S.C. § 16 (e)(2). This language

codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative

history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings

which might have the effect of vitiating the benefits of prompt and less costly settlement through

the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).

Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the
> Court, in making its public interest finding, should . . . carefully consider the
> explanations of the government in the competitive impact statement and its responses
> to comments in order to determine whether those explanations are reasonable under
> the circumstances.

*United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D.

Mo. 1977).

This Court recently examined the role of the district court in reviewing proposed final

judgments in light of the 2004 amendments, confirming that the amendments "effected minimal

changes[] and that this Court's scope of review remains sharply proscribed by precedent and the

nature of Tunney Act proceedings." *SBC Commc'ns*, 2007 WL 1020746, at *9. This Court

concluded that the amendments did not alter the articulation of the public interest standard in

*Microsoft. See id.* at *15.

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: May 22, 2007

Respectfully submitted,

Frederick H. Parmenter
VA Bar No. 18184
Attorney
U.S. Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, DC 20530
(202) 307-0620

## CERTIFICATE OF SERVICE

I, Frederick H. Parmenter, hereby certify that on May 23, 2007, I caused a copy of the foregoing Competitive Impact Statement to be served on defendants Cemex, S.A.B. de C.V. and Rinker Group Limited by mailing the document electronically to the duly authorized representative of the defendant as follows:

**Counsel for Defendant Cemex, S.A.B. de C.V.**

John E. Beerbower, Esquire
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 110019
jbeerbower@cravath.com

**Counsel for Defendant Rinker Group Limited**

Kevin J. Arquit, Esquire
Peter C. Thomas, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
karquit@stblaw.com
pthomas@stblaw.com

Frederick H. Parmenter
VA Bar No. 18184
Attorney
U.S. Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530
(202) 307-0620

32