# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W.<br>Suite 3000<br>Washington, D.C. 20530,<br><br>       Plaintiff,<br><br>       v.<br><br>CEMEX, S.A.B. de C.V.,<br>Av. Ricardo Margàin Zozaya #325,<br>Colonia del Valle Campestre,<br>Garza García, Nuevo León, Mexico 66265<br><br>       and<br><br>RINKER GROUP LIMITED<br>Level 8, Tower B, 799 Pacific Highway<br>Chatsworth, NSW 2067, Australia,<br><br>       Defendants. | CASE NO.: 1:07-cv-00640<br><br>JUDGE: Hon. Royce C. Lamberth<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## MOTION AND MEMORANDUM OF
## THE UNITED STATES IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C.

§ 16(b)-(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final

Judgment filed in this civil antitrust case.  Defendants Cemex, S.A.B. de C.V. ("Cemex") and

Rinker Group Limited ("Rinker") have stipulated to the entry of the proposed Final Judgment

upon compliance with the APPA and do not object to entry of this proposed Final Judgment

without a hearing.  The Competitive Impact Statement ("CIS"), filed May 23, 2007, explains why

entry of the proposed Final Judgment is in the public interest.  The United States is filing with

this motion a Certificate of Compliance setting forth the steps taken by the parties to comply with

all applicable provisions of the APPA and certifying that the statutory waiting periods have

expired. Thus, the proposed Final Judgment may be entered at this time without further hearing

if the Court determines that entry is in the public interest. Entry of the proposed Final Judgment

would terminate this action, except that the Court would retain jurisdiction to construe, modify,

or enforce the provisions of the proposed Final Judgment and to punish violations thereof.[1]

**MEMORANDUM**

I.      **Background**

   A.      **Pre-Complaint Investigation**

On October 27, 2006, Cemex Australia Pty Ltd, an entity controlled by Cemex, initiated a

hostile cash tender offer to acquire all of the outstanding shares of Rinker. The total enterprise

value of the transaction offer at the time, including Rinker's debt, was approximately $12 billion.

The United States Department of Justice ("Department") initiated its investigation in November

2006, and over a four-month period conducted an extensive investigation into the competitive

effects of the transaction. As part of the investigation, the Department obtained considerable

---

[1] This transaction involved a cash tender offer. On June 18, 2007, Cemex obtained
control of the Rinker board of directors. In keeping with the United States's standard practice,
neither the proposed Final Judgment nor the Amended Hold Separate Stipulation and Order
("AHSSO") prohibited Cemex from obtaining control of the board of directors. *See* ABA
Section of Antitrust Law, *Antitrust Law Developments* 387 (5th ed. 2002) (noting that "[t]he
Federal Trade Commission (as well as the Department of Justice) will permit the underlying
transaction to close during the notice and comment period"). Such a prohibition could interfere
with many time-sensitive deals and prevent or delay the realization of substantial efficiencies. In
consent decrees requiring divestitures, it is also standard practice to include a "preservation of
assets" clause in the decree and to file a stipulation to ensure that the assets to be divested remain
competitively viable. That practice has been followed here. Proposed Final Judgment ¶ VIII. In
addition, the AHHSO has been filed and entered by the Court in this case.

information and materials from Cemex and Rinker and issued eleven Civil Investigative

Demands to third parties. More than 250 interviews were conducted of customers, competitors,

federal and state agency officials, and other individuals with knowledge of the industries

impacted by the transaction. The investigative staff carefully analyzed the information that was

gathered and thoroughly considered all of the issues presented. The Department considered the

potential competitive effects of the transaction with respect to a variety of construction materials

produced by Cemex and Rinker and concluded that the combination of Cemex and Rinker likely

would lessen competition in: (1) the "large project" ready mix concrete markets in the

metropolitan areas of Fort Walton Beach/Panama City/Pensacola, Jacksonville, Orlando,

Tampa/St. Petersburg, and Fort Myers/Naples, Florida, and the metropolitan areas of Flagstaff

and Tucson, Arizona; (2) the concrete block markets in the metropolitan areas of Tampa/St.

Petersburg and Fort Myers/Naples, Florida; and (3) the market for aggregate that meets state

department of transportation or American Society of Testing Materials specifications for use in

asphalt concrete and ready mix concrete in Tucson, Arizona.

### 1.    Ready Mix Concrete

Ready mix concrete is a building material made of a combination of cement, fine and

coarse aggregate, small amounts of chemical additives, and water. It is made at production

facilities called batch plants and transported in heavy-duty trucks with rotating drums. Ready

mix concrete is unique because it is pliable when freshly mixed, can be molded into a variety of

forms, and it is strong and permanent when hardened. For many building applications, customers

will not substitute other building materials, such as steel, wood, or asphalt, for ready mix

concrete.

3

Not all suppliers of ready mix concrete can service every kind of project. For example, servicing certain types of large projects, such as large state department of transportation highway and bridge building projects and high-rise building projects, requires ready mix concrete suppliers to have: (a) multiple ready mix concrete plants in a geographic area; (b) the ability to produce large amounts of concrete with multiple specifications; (c) backup plants; (d) a large number of concrete trucks; (e) a sizeable and well-trained workforce; (f) the demonstrated ability to service such a large project; and (g) considerable financial backing to remedy any problems relating to defective concrete. A small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete without the characteristics described above with sufficient frequency so as to make such a price increase unprofitable.

The cost of transporting ready mix concrete is high compared to the value of the product. In addition, because concrete begins to set while being driven to the job site, it is highly perishable. Because of its perishability and the cost of hauling concrete, depending on the size of the city and the associated traffic, the distance concrete can reasonably be transported for large projects is limited to a metropolitan area and, in many cases, to only portions of that area.

The acquisition of Rinker by Cemex would reduce the number of suppliers of ready mix concrete that might bid on certain types of large projects from three to two in metropolitan Tampa/St. Petersburg and Fort Walton Beach/Panama City/Pensacola, Florida, and in metropolitan Tucson, Arizona; from four to three generally, and in some areas or for some projects from three to two, in metropolitan Orlando, metropolitan Fort Myers/Naples, and

4

metropolitan Jacksonville, Florida; and from two to one in metropolitan Flagstaff, Arizona.  As a result, the transaction would lessen competition for ready mix concrete in the affected areas and likely would lead to higher prices.

### 2.    Concrete Block

Concrete block is a construction material used to build exterior and interior walls in residential and commercial structures.  In Florida, from Orlando south, the walls of residential structures are built almost exclusively with concrete block.  For nearly all residential construction applications in this geographic area, an increase in the price of concrete block would not cause the purchasers of concrete block to substitute another product.

The cost of transporting concrete block is high compared to the value of the product. Manufacturers or third-party haulers deliver concrete block to customer job sites by truck.  As delivery distance increases, the ratio of transportation costs to the price of concrete block increases.  In urban areas, this most often confines the transport of concrete block to the metropolitan area.  Consequently, an increase in the price of block would not cause customers to purchase block from outside the metropolitan area where they are located.

The acquisition, as originally proposed, would have given Cemex control of approximately 60 percent of the concrete block capacity in metropolitan Tampa/St. Petersburg and approximately 69 percent of the concrete block capacity in metropolitan Fort Myers/Naples. As a result, the transaction would lessen competition for concrete block in the affected areas and likely would lead to higher prices.

### 3.    Aggregate

Aggregate is rock mined from either quarries or pits that is used to make ready mix

5

concrete and asphalt concrete. It must meet state departments of transportation or American

Society of Testing Materials specifications for the specific type of asphalt or ready mix concrete

being produced. There are no substitutes for aggregate because aggregate differs from other

types of stone products in its physical composition, functional characteristics, customary uses,

and pricing. A small but significant post-acquisition increase in the price of aggregate that meets

state departments of transportation and American Society of Testing Materials specifications for

use in ready mix concrete and asphalt projects would not cause the purchasers of such aggregate

to substitute another product.

Aggregate is a bulky, heavy, and relatively low-cost product. The cost of transporting

aggregate is high compared to the value of the product and limits the distance aggregate can be

economically transported from an aggregate pit. Consequently, a small but significant post-

acquisition increase in the price of aggregate in metropolitan Tucson would not cause customers

of aggregate to procure aggregate in sufficient quantities from beyond metropolitan Tucson.

The acquisition, as originally proposed, would have reduced the number of significant

suppliers of aggregate from five to four in the Tucson market generally and, depending on the

location of the aggregate pit and the transportation costs, the number of suppliers could be

reduced to as few as three or two. As a result, the transaction would lessen competition for ready

mix concrete in the affected areas and likely would lead to higher prices.

### B.    The Proposed Final Judgment and Post-Complaint Investigation

On April 4, 2007, along with the complaint, the Department filed a Hold Separate

Stipulation and Order ("HSSO") and a proposed Final Judgment. Because the transaction

involved a hostile cash tender offer and Rinker had not agreed to be acquired, Rinker was not

6

named as a defendant in the Complaint. The proposed Final Judgment provided that, should

Cemex and Rinker subsequently reach an agreement relating to Cemex's acquisition of any

interest in Rinker, Cemex must require Rinker to sign and become a party to an amended HSSO.

The Court signed the HSSO on April 10, 2007, and entered it on April 11, 2007.

On April 9, 2007, Cemex announced that it had entered into a Bid Agreement with

Rinker. As a result of Cemex and Rinker entering into the Bid Agreement, the United States

amended its Complaint to include Rinker as a defendant, and Rinker signed and became a party

to the Amended Hold Separate Stipulation and Order ("AHSSO") and a party to the proposed

Final Judgment. On May 2, 2007, the Court signed and entered the AHSSO. On May 23, 2007,

the Department filed the CIS.

The proposed Final Judgment seeks to eliminate the anticompetitive effects of the

acquisition by requiring Cemex to divest production and distribution facilities in: (1) the large

project ready mix markets in the metropolitan areas of Fort Walton Beach/Panama

City/Pensacola, Jacksonville, Orlando, Tampa/St. Petersburg, Fort Myers/Naples, Florida, and

the metropolitan areas of Flagstaff and Tucson, Arizona; (2) the concrete block markets in

Tampa/St. Petersburg and Fort Myers/Naples, Florida; and (3) the aggregate market in Tucson,

Arizona. In the ready mix concrete markets, it requires Cemex to divest eight ready mix concrete

plants in metropolitan Fort Walton Beach/Panama City/Pensacola, two plants in metropolitan

Jacksonville, four plants in metropolitan Orlando, six plants in metropolitan Tampa/St.

Petersburg, six plants in metropolitan Fort Myers/Naples, four plants in Tucson, and one plant in

metropolitan Flagstaff. In the concrete block markets, it requires Cemex to divest three concrete

block plants in metropolitan Tampa/St. Petersburg and three in Fort Myers/Naples, Florida. In

7

the aggregate market in Tucson, Arizona, it requires Cemex to divest two aggregate facilities.

The proposed Final Judgment also requires Cemex to divest assets such as trucks, manufacturing

equipment, contracts, and supply agreements needed for the production and distribution of ready

mix concrete, concrete block, and aggregate.

The Department is confident that the divestiture by Cemex of the assets set forth in the

proposed Final Judgment will remedy the violation alleged in the Complaint. In each

metropolitan area for ready mix concrete, the divestitures will establish a new, independent, and

economically viable competitor that can bid on large projects, such as highways, bridges, and

high-rise buildings. In metropolitan Tampa/St. Petersburg and Fort Myers/Naples, the

divestitures will also establish new, independent, and economically viable competitors that can

produce and distribute concrete block in each metropolitan area. Further, the divestitures will

provide the new ready mix concrete competitor in Tucson, Arizona, with sufficient aggregate

reserves to compete effectively in that market. As of this filing, Cemex is making substantial

efforts to divest the assets in compliance with the proposed Final Judgment.

## II.    Compliance with the APPA

The APPA requires a sixty-day period for the submission of public comments on a

proposed Final Judgment. *See* 15 U.S.C. § 16(b). In compliance with the APPA, the United

States filed the CIS in this Court on May 23, 2007; published the CIS in the *Federal Register* on

June 12, 2007, *see United States v. Cemex, S.A.B. de C.V.,* 72 Fed. Reg. 32314-31, 2007 WL

1668708; and published summaries of the terms of the proposed Final Judgment and CIS,

together with directions for the submission of written comments relating to the proposed Final

Judgment, in *The Washington Post* for seven days beginning on June 16, 2007 and ending on

8

June 22, 2007.

The sixty-day period for public comments ended on August 21, 2007; the Division

received no comments. As recited in the Certificate of Compliance filed simultaneously with

this Motion, all the requirements of the APPA now have been satisfied. It is therefore

appropriate for the Court to make the public interest determination required by 15 U.S.C. § 16(e)

and to enter the Final Judgment.

### III.    Standard of Judicial Review Under the APPA for the Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the Court shall determine

whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).

In making that determination, the court, in accordance with amendments to the APPA in 2004, is

required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the
> adequacy of such judgment that the court deems necessary to a determination of
> whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging specific
> injury from the violations set forth in the complaint including consideration of the
> public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. SBC Commc'ns, Inc.*, Nos.

05-2102 and 05-2103, 2007 WL 1020746, at *9-16 (D.D.C. Mar. 29, 2007) (assessing public

interest standard under APPA and effect of 2004 amendments).[2] Courts in this circuit have held

– both before and after the 2004 amendments – that the United States is entitled to deference in

crafting its antitrust settlements, especially with respect to the scope of its complaint and the

adequacy of its remedy, which are the "two most significant legal questions" relating to a public

interest determination. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir.

1995);[3] *SBC Commc'ns*, 2007 WL 1020746, at \*12-\*16.

 With respect to the adequacy of the relief secured by the decree, a court may not "engage

in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS,*

*Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General. The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting
> to the decree. The court is required to determine not whether a particular decree is
> the one that will best serve society, but whether the settlement is "*within the*
> *reaches of the public interest* ." More elaborate requirements might undermine
> the effectiveness of antitrust enforcement by consent decree.

---

[2] *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006) (substituting
"shall" for "may" in directing relevant factors for court to consider and amending list of factors to
focus on competitive considerations and to address potentially ambiguous judgment terms). The
2004 amendments do not affect the substantial precedent in this and other circuits analyzing the
scope and standard of review for APPA proceedings. *See SBC Commc'ns*, 2007 WL 1020746, at
\*9 ("[A] close reading of the law demonstrates that the 2004 amendments effected minimal
changes . . . .").

[3] The *Microsoft* court explained that a court making a public interest determination under
the APPA should consider, among other things, the relationship between the remedy secured and
the specific allegations set forth in the government's complaint, whether the decree is sufficiently
clear, whether enforcement mechanisms are sufficient, and whether the decree may positively
harm third parties. *Microsoft*, 56 F.3d at 1458-62.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4]  In making its public interest

determination, a district court must accord due respect to the United States's prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case. *SBC Commc'ns*, 2007 WL 1020746, at *16 (United States entitled to "deference" as to

"predictions about the efficacy of its remedies"); *United States v. Archer-Daniels-Midland Co.*,

272 F. Supp. 2d 1, 6 (D.D.C. 2003).

    Court approval of a final judgment requires a standard more flexible and less strict than

the standard required for a finding of liability.  "[A] proposed decree must be approved even if it

falls short of the remedy the court would impose on its own, as long as it falls within the range of

acceptability or is 'within the reaches of public interest.'"  *United States v. AT&T Co.*, 552 F.

Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716); *see also*

*United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the

consent decree even though the court would have imposed a greater remedy).  To meet this

standard, the United States "need only provide a factual basis for concluding that the settlements

are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 2007 WL 1020746, at

*16.

    Moreover, the Court's role under the APPA is limited to reviewing the remedy in

---

    [4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F.
Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the
overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"),
*aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). *See generally Microsoft*, 56
F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with
the allegations charged as to fall outside of the 'reaches of public interest'").

relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 2007 WL 1020746, at *14.

In its 2004 amendments to the Tunney Act, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 2007 WL

1020746, at *9.[5]

## IV.    Conclusion

For the reasons set forth in this Motion and the CIS, the Court should find the proposed

Final Judgment is in the public interest and should enter the attached proposed Final Judgment

without further hearings.  The United States respectfully requests that the attached Final

Judgment be entered as soon as possible.

Dated: August 30, 2007

Respectfully submitted,

Frederick H. Parmenter
VA Bar No. 18184
Attorney
United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street N.W., Suite 3000
Washington, D.C. 20530
(202) 307-0620

---

[5] *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) 61,508, at 71,980 (W.D. Mo. 1977) ("[T]he Court, in making its public interest finding, should . . . carefully consider the explanations of the government in order to determine whether those explanations are reasonable under the circumstances.")

13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 1:07-cv-00640 |
| Plaintiff, | JUDGE: Hon. Royce C. Lamberth |
| v. | DECK TYPE:  Antitrust |
| CEMEX, S.A.B. de C.V. and RINKER GROUP LIMITED, | DATE STAMPED: |
| Defendants. | |

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Amended Complaint on May 2, 2007, and plaintiff and defendants, Cemex, S.A.B. de C.V. ("Cemex") and Rinker Group Limited ("Rinker"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Cemex agrees to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Cemex to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires Cemex to make certain divestitures for the purpose of remedying the loss of competition alleged in the Amended Complaint;

AND WHEREAS, Cemex has represented to the United States that the divestitures required below can and will be made and that Cemex will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Amended Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom Cemex divests some or all of the Divestiture Assets.

B.    "Aggregate" means crushed stone and gravel produced at quarries, mines, or gravel pits used for, among other things, the production of ready mix concrete and concrete block.

C.    "Cemex" means defendant Cemex, S.A.B. de C.V., a Mexican corporation with its headquarters in Nuevo León, Mexico, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

2

D.    "Concrete block" means a building material used in the construction of residential and commercial structures that is produced at a plant by mixing cementitious material, aggregate, chemical additives, and water, and placing that mixture in molds of various sizes.

E.    "Divestiture Assets" means:

    1.    the following Ready Mix Concrete plants:

        a.    **Fort Walton Beach/Panama City/Pensacola, Florida Area**

            i.    Rinker's Crestview plant, located at 5420 Fairchild Road, Crestview, FL 32539;

            ii.    Rinker's Fort Walton plant, located at 1787 FIM Boulevard, Fort Walton Beach, FL 32547;

            iii.    Rinker's Milton plant, located at 6250 Da Lisa Road, Milton, FL 32583;

            iv.    Rinker's Panama City plant, located at 1901-B East 15th Street, Panama City, FL 32405;

            v.    Rinker's Panama City Beach plant, located at 17750 Hutchinson Road, Panama City Beach, FL 32407;

            vi.    Rinker's Pensacola plant, located at 415 Hyatt Street, Pensacola, FL 32503;

            vii.    Rinker's Port St. Joe plant, located at 1145 Industrial Road, Port St. Joe, FL 32456;

3

            viii.    Rinker's Point Washington plant, located at the intersection of East Highway 98 and Old Ferry Road, Santa Rosa Beach, FL 32459;

    b.    **Jacksonville, Florida Area**

            i.    Cemex's Main Street plant, located at 9214 North Main Street, Jacksonville, FL 32218;

            ii.    Cemex's Southside Florida Mining Boulevard plant, located at 9715 East Florida Mining Boulevard, Jacksonville, FL 32223;

    c.    **Orlando, Florida Area**

            i.    Cemex's East Orlando plant, located at 7400 Narcoossee Road, Orlando, FL 32822;

            ii.    Cemex's Goldenrod plant, located at 4000 Forsyth Road, Winter Park, FL 32792;

            iii.    Cemex's Winter Garden plant, located at 201 Hennis Road, Winter Garden, FL 34787;

            iv.    Rinker's Kennedy plant, located at 1406 Atlanta Avenue, Orlando, FL 32806;

    d.    **Tampa/St. Petersburg, Florida Area**

            i.    Rinker's Clearwater plant, located at 3757 118th Avenue North, Clearwater, FL 33762;

4

    ii.      Rinker's Odessa plant, located at 12025 State Road 54, Odessa, FL 33556;

    iii.     Rinker's Odessa Keys plant, located at 11913 State Road 54, Odessa, FL 33556;

    iv.     Rinker's Riverview plant, located at 6723 South 78th Street, Riverview, FL 33569;

    v.      Rinker's Tampa plant, located at 6106 East Hanna Avenue, Tampa, FL 33610;

    vi.     Rinker's Tampa Keys plant, located at 1811 North 57th Street, Tampa, FL 33619;

e.    **Fort Myers/Naples, Florida Area**

    i.      Rinker's Ave Maria plant, located at 4811 Ave Maria Boulevard, Immokalee, FL 34142;

    ii.      Rinker's Bonita Springs plant, located at 25061 Old U.S. Highway 41 South, Bonita Springs, FL 34135;

    iii.     Rinker's Canal Street plant, located at 4262 Canal Street, Fort Myers, FL 33916;

    iv.     Rinker's Cape Coral (Pine Island) plant, located at 2401 SW Pine Island Road, Cape Coral, FL 33991;

    v.      Rinker's Naples plant, located at 9210 Collier Boulevard, Naples, FL 34114;

vi.   Rinker's South Fort Myers plant, located at 7270 Alico Road, Fort Myers, FL 33912;

f.   **Flagstaff, Arizona Area**

Cemex's Brannen plant, located at 633 East Brannen Avenue, Flagstaff, AZ 86001;

g.   **Tucson, Arizona Area**

i.   Cemex's Ina plant, located at 5400 West Massingale Road, Tucson, AZ 85743;

ii.   Rinker's Green Valley plant, located at 18701 South Old Nogales Highway, Sahuarita, AZ 85629;

iii.   Rinker's Poorman Road plant, located at 6500 South Old Spanish Trail, Tucson, AZ 85747;

iv.   Rinker's Valencia plant, located at 1011 West Valencia Road, Tucson, AZ 85706;

2.   the following Concrete Block plants:

a.   **Tampa/St. Petersburg, Florida**

i.   Rinker's Odessa plant, located at 12025 State Road 54, Odessa, FL, 33556;

ii.   Rinker's Palmetto plant, located at 600 9th Street West, Palmetto, FL, 34221;

iii.   Rinker's Tampa plant, located at 6302 North 56th Street, Tampa, FL 33610;

6

     b.     **Fort Myers/Naples, Florida Area**

          i.     Rinker's Bonita Springs plant, located at 25091 Old U.S. Highway 41 South, Bonita Springs, FL 34135;

          ii.     Rinker's Coral Rock plant, located at 41451 Cook Brown Road, Punta Gorda, FL 33982;

          iii.     Rinker's South Fort Myers plant, located at 7270 Alico Road, Fort Myers, FL 33912;

3.     the following **Tucson, Arizona** area Aggregate plants:

     a.     Cemex's Ina plant, located at 5400 West Massingale Road, Tucson, AZ 85743;

     b.     Rinker's Green Valley plant, located at 18701 South Old Nogales Highway, Sahuarita, AZ 85629;

4.     all tangible assets used in the plants listed in paragraphs II(E)(1)-(3), including all research and development activities, manufacturing equipment, tooling and fixed assets, real property (leased or owned), mining equipment, personal property, inventory, aggregate reserves, office furniture, materials, supplies, on- or off-site warehouses or storage facilities relating to the plants; all licenses, permits and authorizations issued by any governmental organization relating to the plants; all contracts, agreements, leases (including renewal rights), commitments, and understandings relating to the plants, including supply agreements; all customer lists, contracts, accounts, and credit records relating to the plants;

7

all other records relating to the plants; and at the option of the Acquirer or

Acquirers, a number of trucks and other vehicles usable at the plants listed

in paragraphs II(E)(1)-(3) equal to, for each separate type of truck or other

vehicle, the average number of trucks and other vehicles of that type used

at each such plant per month during the months of operation of the plant

between January 1, 2006 and December 31, 2006 (calculated by averaging

the number of trucks and other vehicles of each type that were used at each

plant at any time during each month that the plant was in operation), but

such trucks and vehicles need not include any equipment related to

Cemex's "ReadySlump" process, so long as the trucks and other vehicles

are fully operable without such equipment; and

5. all intangible assets used in the development, production, servicing, and

distribution of products by the facilities listed in paragraphs II(E)(1)-(3),

including but not limited to all contractual rights, patents, licenses and

sublicenses, intellectual property, technical information, computer

software (including dispatch software and management information

systems) and related documentation, know-how, trade secrets, drawings,

blueprints, designs, design protocols, specifications for materials,

specifications for parts and devices, safety procedures for the handling of

materials and substances, quality assurance and control procedures, design

tools and simulation capability, all manuals and technical information

provided to the employees, customers, suppliers, agents or licensees, and

all research data (including aggregate reserve testing information) concerning historic and current research and development efforts relating to the plants listed in paragraphs II(E)(1)-(3), including, but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.

F.     "Ready mix concrete" means a building material used in the construction of buildings, highways, bridges, tunnels, and other projects that is produced by mixing a cementitious material and aggregate with sufficient water to cause the cement to set and bind.

G.     "Rinker" means defendant Rinker Group Limited, an Australian corporation with its headquarters in Chatswood, Australia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

H.     "Divestiture Trigger" means the day on which Cemex elects a majority of the Board of Directors of Rinker or forty-five (45) days after Cemex obtains a number of shares of Rinker stock in excess of 50 percent of the outstanding shares of Rinker, whichever is sooner.

## III. Applicability

A.     This Final Judgment applies to Cemex, as defined above, and all other persons in active concert or participation with Cemex who receive actual notice of this Final Judgment by personal service or otherwise.

B.     Cemex shall require, as a condition of the sale or other disposition of all or substantially all of its assets or of lesser business units that include the Divestiture Assets, that the purchaser agrees to be bound by the provisions of this Final Judgment.

9

## IV. Divestitures

A.      Cemex is ordered and directed, within one hundred twenty (120) calendar days

after the Divestiture Trigger, or five (5) days after notice of the entry of this Final Judgment by

the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this

Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion.

The United States, in its sole discretion, may agree to one or more extensions of this time period,

not to exceed in total sixty (60) calendar days, and shall notify the Court in each such

circumstance.  Cemex agrees to use its best efforts to divest the Divestiture Assets as

expeditiously as possible.

B.      In accomplishing the divestitures ordered by the Final Judgment, Cemex promptly

shall make known, by usual and customary means, the availability of the Divestiture Assets.

Cemex shall inform any person making inquiry regarding a possible purchase of the Divestiture

Assets that they are being divested pursuant to this Final Judgment and provide that person with

a copy of this Final Judgment.  Unless the United States otherwise consents in writing, Cemex

shall offer to furnish to all prospective Acquirers, subject to customary confidentiality

assurances, all information and documents relating to the Divestiture Assets that customarily are

provided in a due diligence process except such information or documents subject to the

attorney-client or work-product privilege.  Cemex shall make available such information to the

United States at the same time that such information is made available to any other person.

C.      Unless the United States otherwise consents in writing, Cemex shall provide the

Acquirer or Acquirers and the United States information relating to personnel involved in

production, operations, and sales at the Divestiture Assets to enable the Acquirer or Acquirers to

make offers of employment. Cemex will not interfere with any negotiations by the Acquirer or Acquirers to employ any employee of the Divestiture Assets whose primary responsibility is production, operations, or sales at the Divestiture Assets.

D.     Unless the United States otherwise consents in writing, Cemex shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, and other documents and information customarily provided as part of a due diligence process.

E.     Cemex shall warrant to the Acquirer or Acquirers that those Divestiture Assets owned by Cemex prior to an acquisition of Rinker will be operational on the date of the divestiture. In addition, with respect to those Divestiture Assets owned by Rinker prior to an acquisition by Cemex, Cemex shall warrant to the Acquirer or Acquirers that those Divestiture Assets will be operational on the date of the divestiture, if they were operational on the date Cemex acquires a number of shares of Rinker stock in excess of 50 percent of the outstanding shares of Rinker.

F.     Cemex shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

G.     Cemex shall warrant to the Acquirer or Acquirers that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of those Divestiture Assets owned by Cemex prior to an acquisition of Rinker. In addition, with respect to those Divestiture Assets owned by Rinker prior to an acquisition by Cemex, Cemex shall

11

warrant to the Acquirer or Acquirers that there are no material defects in the environmental,
zoning, or other permits pertaining to the operation of those Divestiture Assets,  if there are no
material defects in the environmental, zoning, or other permits pertaining to the operation of
those Divestiture Assets on the date Cemex acquires a number of shares of Rinker stock in
excess of 50 percent of the outstanding shares of Rinker.  Cemex shall not undertake, directly or
indirectly, any challenges to the environmental, zoning, or other permits relating to the operation
of the Divestiture Assets.

  H.  If for any reason Cemex is unable within the time period required by paragraph
IV(A) to divest any of the Divestiture Assets or make any of the Divestiture Assets available for
sale by the trustee appointed pursuant to Section V, or if for any reason Cemex does not make the
warranties in paragraphs IV(E) and (G) with respect to the assets owned by Rinker prior to an
acquisition by Cemex, for each such asset, the United States, in its sole discretion, may select one
or more alternative assets owned by Cemex that are located or used in the same geographic area
(as identified in boldface type in section II(E)) to be divested in lieu of the Divestiture Asset that
could not be divested.  Unless the United States consents otherwise in writing, divestiture of an
alternative Cemex asset shall include all tangible and intangible assets associated with that asset,
as defined in paragraph II(E).

  I.  Unless the United States otherwise consents in writing, any divestiture pursuant to
Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include
the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United
States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer or
Acquirers as viable, ongoing businesses engaged in producing and distributing ready mix

concrete, concrete block, and/or aggregate, that the Divestiture Assets will remain viable, and

that the divestiture of such assets will remedy the competitive harm alleged in the Amended

Complaint.  The sale of the Divestiture Assets may be made to one or more Acquirers, so long

as:  (1) all of the ready mix concrete plants in a geographic area (as identified in boldface type in

section II(E)) are divested to a single Acquirer; (2) all of the concrete block plants in a

geographic area are divested to a single Acquirer; (3) both aggregate plants listed in paragraph

II(E)(3) are divested to the same Acquirer that acquires the ready mix concrete plants listed in

paragraphs II(E)(1)(g)(i)-(iii); and (4) in each instance it is demonstrated in a manner acceptable

to the United States in its sole discretion that the Divestiture Assets will remain viable and the

divestiture of such Divestiture assets will remedy the competitive harm alleged in the Amended

Complaint.  The divestitures, whether pursuant to Section IV or Section V of this Final

Judgment,

    1.    shall be made to an Acquirer or Acquirers that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) to compete effectively in the production and distribution of ready mix concrete, concrete block, and/or aggregate; and

    2.    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer or Acquirers and Cemex gives Cemex the ability to unreasonably raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively in the

production and distribution of ready mix concrete, concrete block, and/or

aggregate.

J.      If Cemex does not acquire a number of shares of Rinker stock in excess of 50

percent of the outstanding shares of Rinker, Cemex shall divest all its interest in Rinker within

six months from the date this Final Judgment is signed by the Court.  Pending such divestiture,

Cemex shall not, directly or indirectly: (1) exercise dominion or control over, or otherwise seek

to influence, the management, direction, or supervision of the business of Rinker; (2) seek or

obtain representation on the Board of Directors of Rinker; (3) exercise any voting rights attached

to the shares; (4) seek or obtain access to any confidential or proprietary information of Rinker;

or (5) take any action or omit to take any action that would have an effect different than if

Cemex's interest in Rinker were that of a purely passive investor.

## V. Appointment of Trustee to Effect Divestitures

A.      If Cemex has not divested the Divestiture Assets within the time period specified

in paragraph IV(A), Cemex shall notify the United States of that fact in writing.  Upon

application of the United States, the Court shall appoint a trustee selected by the United States

and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets.  The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate.  Subject to paragraph V(D) of this Final Judgment, the trustee may hire at the

cost and expense of Cemex any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

C.     Cemex shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objection by Cemex must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.     The trustee shall serve at the cost and expense of Cemex, on such terms and conditions as plaintiff approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Cemex and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.     Cemex shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Cemex shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade

15

secrets or other confidential research, development, or commercial information. Cemex shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.     After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.     If the trustee has not accomplished such divestiture within six months after its appointment, the trustee shall promptly file with the Court a report setting forth: (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the plaintiff, who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. <u>Notice of Proposed Divestiture</u>

A.       Within two (2) business days following execution of a definitive divestiture

agreement, Cemex or the trustee, whichever is then responsible for effecting the divestiture

required herein, shall notify the United States of any proposed divestiture required by Section IV

or V of this Final Judgment.  If the trustee is responsible, it shall similarly notify Cemex.  The

notice shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an interest

in or desire to acquire any ownership interest in the Divestiture Assets, together with full details

of the same.

B.       Within fifteen (15) calendar days of receipt by the United States of such notice,

the United States may request from Cemex, the proposed Acquirer or Acquirers, any other third

party, or the trustee, if applicable, additional information concerning the proposed divestiture, the

proposed Acquirer or Acquirers, and any other potential Acquirer.  Cemex and the trustee shall

furnish any additional information requested within fifteen (15) calendar days of the receipt of

the request, unless the parties shall otherwise agree.

C.       Within thirty (30) calendar days after receipt of the notice, or within twenty (20)

calendar days after the United States has been provided the additional information requested

from Cemex, the proposed Acquirer or Acquirers, any third party, or the trustee, whichever is

later, the United States shall provide written notice to Cemex and the trustee, if there is one,

stating whether or not it objects to the proposed divestiture.  If the United States provides written

notice that it does not object, the divestiture may be consummated, subject only to Cemex's

limited right to object to the sale under paragraph V(C) of this Final Judgment.  Absent written

notice that the United States does not object to the proposed Acquirer or upon objection by the

United States, a divestiture proposed under Section IV or Section V shall not be consummated.

Upon objection by Cemex under paragraph V(C), a divestiture proposed under Section V shall

not be consummated unless approved by the Court.

## VII. **Financing**

Cemex shall not finance all or any part of any purchase by an Acquirer of any Divestiture

Asset pursuant to Section IV or V of this Final Judgment.

## VIII. **Hold Separate**

Until the divestiture required by this Final Judgment has been accomplished, Cemex shall

take all steps necessary to comply with the Amended Hold Separate Stipulation and Order

entered by this Court.  Cemex shall take no action that would jeopardize the divestiture ordered

by this Court.

## IX. **Affidavits**

A.    Within twenty (20) calendar days of the Divestiture Trigger, and every thirty (30)

calendar days thereafter until the divestitures have been completed under Section IV or V,

Cemex shall deliver to the United States an affidavit as to the fact and manner of its compliance

with Section IV or V of this Final Judgment.  Each such affidavit shall include the name, address,

and telephone number of each person who, during the preceding thirty days, made an offer to

acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted

or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in

detail each contact with any such person during that period.  Each such affidavit shall also

include a description of the efforts Cemex has taken to solicit buyers for the Divestiture Assets,

and to provide required information to any prospective Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Cemex, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.     Within twenty (20) calendar days of the filing of the Amended Complaint in this matter, Cemex shall deliver to the United States an affidavit that describes in reasonable detail all actions Cemex has taken and all steps Cemex has implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Cemex shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Cemex's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.     Cemex shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## X. **Compliance Inspection**

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Cemex, be permitted:

1.     access during Cemex's office hours to inspect and copy, or at plaintiff's option, to require Cemex to provide copies of, all books, ledgers, accounts,

19

records and documents in the possession, custody, or control of Cemex, relating to any matters contained in this Final Judgment; and

2.      to interview, either informally or on the record, Cemex's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Cemex.

B.      Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Cemex shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If, at the time information or documents are furnished by Cemex to the United States, Cemex represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Cemex marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Cemex ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  No Reacquisition

Cemex may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date:  _____


        Court approval subject to procedures of the Antitrust
        Procedures and Penalties Act, 15 U.S.C. § 16.


        _____
        United States District Judge

22

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, N.W.<br>Suite 3000<br>Washington, D.C. 20530, | CASE NO.: 1:07-cv-00640 |
| Plaintiff, | JUDGE: Hon. Royce C. Lamberth |
| v. | DECK TYPE: Antitrust |
| CEMEX, S.A.B. de C.V.,<br>Av. Ricardo Margàin Zozaya #325,<br>Colonia del Valle Campestre,<br>Garza García, Nuevo León, Mexico 66265 | DATE STAMP: |
| and | |
| RINKER GROUP LIMITED<br>Level 8, Tower B, 799 Pacific Highway<br>Chatsworth, NSW 2067, Australia, | |
| Defendants. | |

## CERTIFICATE OF COMPLIANCE WITH PROVISIONS
## OF THE ANTITRUST PROCEDURES AND PENALTIES ACT

Plaintiff, United States of America, by the undersigned attorney, hereby certifies that, in compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), the following procedures have been followed in preparation for the entry of final judgment in the above-captioned matter herein:

1.  Plaintiff and defendants have stipulated to the entry of the proposed Final Judgment in an Amended Hold Separate Stipulation and Order ("AHSSO") filed with the Court on May 2, 2007.

2. The proposed Final Judgment was filed with the Court on May 2, 2007.

3. The Competitive Impact Statement was filed with the Court on May 23, 2007.

4. The proposed Final Judgment and Competitive Impact Statement were published in the *Federal Register* on June 12, 2007. *United States v. Cemex, S.A.B. de C.V.,* 72 Fed. Reg. 32314-31, 2007 WL 1668708.

5. A summary of the terms of the proposed Final Judgment was published in *The Washington Post*, a newspaper of general circulation in the District of Columbia, for seven days beginning on June 16, 2007 and ending on June 22, 2007.

6. Copies of the AHSSO, proposed Final Judgment, and Competitive Impact Statement were furnished to all persons requesting them and made available on the Antitrust Division's Internet site.

7. Defendant Rinker Group Limited, on June 18, 2007, and defendant Cemex, S.A.B. de C.V., on June 19, 2007, filed with the Court a description of written or oral communications by or on behalf of the defendant, or any other person, with any officer or employee of the United States concerning the proposed Final Judgment, as required by 15 U.S.C. § 16(g).

8. The sixty-day comment period prescribed by 15 U.S.C. § 16(b) and (d) for the receipt and consideration of written comments, during which the proposed Final Judgment could not be entered, ended on August 21, 2007.

9. The United States did not receive any comments on the proposed Final Judgment.

10. The parties have satisfied all the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), as a condition for entering the proposed Final Judgment,

and it is now appropriate for the Court to make the necessary public interest determination

required by 15 U.S.C. § 16(e) and to enter the proposed Final Judgment.

Dated: August 30, 2007

Respectfully submitted,

Frederick H. Parmenter
VA Bar No. 18184
Attorney
United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, DC 20530
(202) 307-0620

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>CEMEX, S.A.B. de C.V. and<br>RINKER GROUP LIMITED,<br><br>  Defendants. | CASE NO.: 1:07-cv-00640<br><br>JUDGE: Hon. Royce C. Lamberth<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMPED: |

### CERTIFICATE OF SERVICE

I, Frederick H. Parmenter, hereby certify that on August 3 0, 2007, I caused a copy of the foregoing Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act and the Motion and Memorandum of the United States in Support of Entry of Final Judgment with the attached proposed Final Judgment to be served on defendants CEMEX, S.A.B. de C.V. and RINKER GROUP LIMITED by mailing the documents electronically to the duly authorized legal representatives of each defendant, as follows:

Counsel for CEMEX, S.A.B. de C.V.:

John E. Beerbower, Esquire
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1864
jbeerbower@cravath.com

Counsel for RINKER GROUP LIMITED:

Kevin Arquit, Esquire
Peter C. Thomas, Esquire
Simpson, Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-7680
pthomas@stblaw.com

Clifford H. Aronson, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
(212) 735-2644
caronson@skadden.com


Frederick H. Parmenter
VA Bar No. 18184
Attorney
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530
(202) 307-0620